IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| GREGORY KERLIN, | : | |
| Plaintiff, | : | |
| | : | Case No. 3:09cv00173 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I. **Introduction**

Plaintiff Gregory Kerlin filed an application for Disability Insurance Benefits (DIB) with the Social Security Administration asserting he has been unable to work since July 5, 2004 due to extreme low back pain and left leg pain. (Tr. 80, 91-92).

After various administrative proceedings, including two hearings, *see* Tr. 457-514, Administrative Law Judge (ALJ) Thomas R. McNichols II denied Plaintiff's DIB application based on his conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act. (Tr. 17-29). The ALJ's non-disability determination and the resulting denial of benefits later became the final decision of the Social Security Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. §405(g), which Plaintiff now is due.

This case is before the Court on Plaintiff's Statement of Errors (Doc. #11), the

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Commissioner's Memorandum in Opposition (Doc. #15), the administrative record, and the record as a whole.

Plaintiff seeks an Order that, at a minimum, remands this case to the Social Security Administration to correct certain claimed errors. The Commissioner seeks a Judgment affirming the ALJ's decision.

## II.     Background

### A.     Plaintiff and His Testimony

Plaintiff was forty-two years old on the date his disability allegedly began. He was therefore considered a "younger person" for the purpose of resolving his DIB application. *See* 20 C.F.R. § 404.1563(c). Plaintiff graduated from high school and worked for twenty-three years as a polisher for a tool and die company.

At the time of the ALJ's first hearing (February 2008) Plaintiff was six feet tall and weighed about 305 pounds. (Tr. 460). He lived with his wife and two dependent children. (Tr. 461).

Plaintiff testified that his last day of work was July 4, 2004 when his back "went out." (Tr. 463). The injury probably did not surprise Plaintiff because he had at least a thirteen-year history of back problems including problems requiring back surgery in 1995. (Tr. 464). The administrative record confirms this through a July 1995 MRI report, which concluded that Plaintiff had large broad-based pedicle disk herniation with left S1 nerve root effacement. (Tr. 300). In August 2005 a surgeon performed a microlumbar discectomy at L5. (Tr. 164). Plaintiff returned to part-time work after recovering for six months and full-time work without restrictions after nine months. (Tr. 464; *see* Doc. #11 at 3).

At the time of the ALJ's first hearing, Plaintiff was experiencing severe pain in his lower back. A physician told him he has degenerative disc disease. (Tr. 464). Various types of treatment – injections, physical therapy, chiropractic therapy – have not helped

2

alleviate his back pain. He took Percocet as needed for back pain and it helps him. (Tr. 471). Yet Plaintiff's pain was constant – all day every day. (Tr. 472). On a scale from zero (no pain) to ten (worst imaginable pain) Plaintiff estimated his pain level between six and seven. (Tr. 472). His back pain also radiated into his left leg when he overexerted. (Tr. 473).

The most comfortable position for Plaintiff was laying on his side in the fetal position. (Tr. 473). He did not sleep very well. He estimated that he could walk fifty to one hundred yards. At that point his back pain would flare up causing him to stop. Plaintiff estimated that he could stand for one-half hour and sit for one-half hour. (Tr. 474). He estimated that he could lift thirty to forty pounds "just one time." *Id*. But he could lift and carry less than ten pounds only a few times per day. (Tr. 481). It was very difficult for him to climb stairs. (Tr. 475).

Plaintiff has diabetes for which he takes Actos. (Tr. 466). He testified that diabetes causes him to never feel good. (Tr. 467). He also has high blood pressure, which medication controls. (Tr. 468).

Plaintiff has depression. He explained that he has a lot of trouble dealing with every-day activities, and he has a lot of bitterness and anger issues. (Tr. 468-69). He goes to counseling every other week and sees a psychiatrist every three months. He further testified that depression prevents him from working because he does not feel like getting up or going anywhere. When asked if he had resigned himself to remain in this condition for the rest of his life, Plaintiff answered, "I've spent 15 years trying to find an answer to this. To date, I have not found one." (Tr. 470). He went to the hospital emergency room in April 2007 for an "emotional breakdown." (Tr. 471). He has crying spells and once or twice a week he is unable to get out of bed. (Tr. 483-84). He takes Effexor as prescribed by his psychiatrist. (Tr. 469, 482).

According to Plaintiff, he could no longer do his past work because it required too much standing. He explained that his past job allowed him to stand and sit as needed, but

3

he could not do the work anymore because it also required him to bend. (Tr. 475).

As to his daily activities, Plaintiff occasionally cooks at home but does not do the dishes, make the beds, go to church or to movies, or do any gardening or yardwork. He likes to target shoot with a gun but had not done so for four years. (Tr. 476-77). He tries to walk his dog as often as he can. He is able to feed, dress, and groom himself.

Plaintiff's testimony during the second administrative was very similar, often identical, to the above-summarized testimony. *See* Tr. 493-504. He added that he was trying to be more productive around the house, but he estimated that he spent half the day lying down. (Tr. 398).

**B.    Medical Records and Opinions**

Plaintiff was examined by Dr. Wanat, a specialist in occupational medicine, on November 23, 2004. (Tr. 181-83). On examination Dr. Wanat noted that Plaintiff weighed 305 pounds. Plaintiff got off the examination table after five to ten minutes to move around. He walked with a mild limp. He had diminished symmetrical reflexes in both the upper and lower extremities. He also had generalized tenderness to palpation over the lumbar paraspinal musculature and the sacroiliac joints. A straight leg raise test produced low back pain at 30º on the left and 60º on the right. His EHL (extensor hallucis longus) strength was diminished on the left compared to the right. (Tr. 182).

Dr. Wanat diagnosed chronic low back pain secondary to multilevel degenerative disc disease, facet joint hypertrophy, and mild foramina stenosis, predominantly at the L4-5 and L5-S1 levels. (Tr. 182). Dr. Wanat concluded that Plaintiff "appears to be capable, within a reasonable degree of medical certainty, of performing sedentary work on, at least, a part-time basis." (Tr. 182). Dr. Wanat thought Plaintiff could lift/push/pull up to five pounds frequently and ten pounds occasionally. *Id.* He would need frequent changes in body position and would need to alternate between sitting, standing, and walking every fifteen to twenty minutes. (Tr. 182-83). Dr. Wanat noted that Plaintiff could work up to

4

four continuous hours or up to six hours a day if he split the day in half with a two hour rest at home. (Tr. 183).

Dr. Shaffer, Plaintiff's long-term chiropractor, noted similar limitations in November 2004. He thought that Plaintiff could perform sedentary work with the following restrictions: no bending/climbing/stooping/crawling; alternate sitting/standing/walking approximately every fifteen to thirty minutes as tolerated; and no more than four hours/day or five hours a week. (Tr. 278).

In December 2004 Dr. Shaffer noted lumbar flexion was reduced and straight-leg raising test was positive. There was a "slight weakness (4/5) in the left foot eversion and dorsiflexion." (Tr. 277). Dr. Shaffer concluded that Plaintiff could only sit for fifteen minutes at a time, two hours total. Dr. Shaffer did not think Plaintiff could stand/walk for more than fifteen minutes at a time, two hours total. And Dr. Shaffer characterized Plaintiff's ability to lift and carry as "extremely limited." (Tr. 277).

An MRI in January 2005 showed a mild broad based disc bulge at L5-S1 with scar tissue around the exiting left L5 nerve root. (Tr. 214-15).

One month later Dr. Hill reviewed the file at the request of the Ohio Bureau of Disability Determinations (Ohio BDD). She gave no weight to Dr. Shaffer's opinions because "chiropractors are not acceptable medical sources per the Program...." (Tr. 258). Dr. Hill also thought the restrictions set by Dr. Shaffer "are extreme for the intact function on exams as well...." *Id*. Dr. Hill further opined, "The finding of only sedentary work by Dr. Wanat ... is also not well-supported by the overall good function, stable MRI, and normal EMG." (Tr. 258).

As to Plaintiff's specific work abilities, Dr. Hill opined that Plaintiff could perform light work[2] with certain restrictions. (Tr. 253). He would need to avoid ladders, ropes and scaffolds, and he could only occasionally climb stairs, stoop, kneel, crouch, or crawl.

---

[2] Under the Regulations, "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...." 20 C.F.R. §404.1567(b).

5

(Tr. 254). In June 2005 another physician, Dr. Cruz, stamped her agreement with Dr. Hill's opinions without providing any supporting explanation or separate discussion of the medical evidence. (Tr. 250).

In March 2005 upon referral from Dr. Shaffer, Plaintiff saw neurosurgeon Dr. Fulton for further evaluation. Dr. Fulton noted that Plaintiff was a "very husky" at 6′3′′ and 310 pounds. (Tr. 231). Dr. Fulton noted that flexion was limited to 40º by pain and lumbar extension seemed to aggravate the pain. A straight-leg raising test was equivocally positive on the left at about 50º. Following review of the MRI, Dr. Fulton observed "a significant dessication of the disc at L5-S1 with roughly 30-40% collapse of the disc space." (Tr. 231). Dr. Fulton wrote, in part, "He does have evidence of degenerative disc disease on his MRI and I do believe that is probably where his symptoms are coming from...." *Id*. Dr. Fulton recommended a diskogram "to help confirm that L5-S1 is his pain generator." (Tr. 231).

In April 2005 Dr. Fulton characterized Plaintiff's diskogram as "somewhat inconclusive." (Tr. 225). Dr. Fulton explained, in part, "At L5-S1, he does significant annular tear and degenerative changes on his MRI, but really did not have concordant pain at that level." (Tr. 225). Dr. Fulton believed that surgery would probably not be very beneficial and he recommended chronic pain management. *Id*.

Dr. Fulton completed a form for the Ohio BDD in May 2005 concluding, in part, that Plaintiff would have difficulty with bending, stooping, lifting, and prolonged sitting or standing. (Tr. 222-24).

From April 2005 to January 2007 Plaintiff saw Claire Osborne, D.O., who helped treat his back pain and prescribed pain medications. (Tr. 302-41).

Plaintiff also continued to see his chiropractor, Dr. Shaffer, for treatment. Dr. Shaffer's records document Plaintiff ongoing problems with low back pain without sustained relief. (Tr. 267-70; 344-411, 447-48). By 2007 he was experiencing increased severe muscle spasms from L3-5 bilaterally. (Tr. 344).

6

A May 2007 MRI showed decreased disc height with end plate degenerative changes at L5-S1. (Tr. 345). There was also mild broad disc bulging and scarring in the left lateral recess along with mild to moderate left lateral recess stenosis and left neuroforaminal narrowing. (Tr. 345-46). The MRI report noted, "The possibility of nerve root impingement at this level on the left is suspected." (Tr. 346).

An MRI in March 2008 showed the overall appearance at L5-S1 was unchanged from the previous study. (Tr. 449).

Dr. Shaffer completed a form on January 24, 2008 indicating his opinions Plaintiff could not lift any amount of weight occasionally or frequently. (Tr. 406-07). As before, Dr. Shaffer did not think Plaintiff could stand/walk for more than two hours in an eight-hour workday, and for no more than one-half hour at a time. Likewise, Dr. Shaffer did not think that Plaintiff could sit for more than two hours in an eight-hour workday and for no more than one-half hour at a time. (Tr. 407). Dr. Shaffer did not think that Plaintiff should ever climb, stoop, crouch, kneel, or crawl. Dr. Shaffer also noted that should not push/pull. (Tr. 408). Due to weakness and pain Dr. Shaffer indicated that Plaintiff must avoid heights, machinery, and vibration. (Tr. 409).

In March 2008, upon referral by Dr. Shaffer, Plaintiff underwent another neurosurgical evaluation, this time with Dr. West. (Tr. 431-32). On examination, Dr. West noted palpable tenderness in Plaintiff's lower lumbar region. Range-of-motion testing showed decreased flexion and side bending. Reflexes were equal bilaterally and Plaintiff had good extensor hallucis longus muscle function. A straight-leg raising test was negative on the right but positive on the left at 45º. (Tr. 432). Dr. West reviewed the MRI done on March 8, 2008 and noted that there was no disc herniation. *Id*. Still, Dr. West confirmed that there was some post-operative scar tissue formation with some decreased disc space height at L5-S1. *Id*.

Dr. West diagnosed post-laminectomy syndrome and degenerative disc disease at L5-S1. *Id*. Dr. West thought that Plaintiff should hold off on any further surgery until his

7

pain becomes absolutely intolerable. Dr. West recommended continuing Plaintiff on "conservative care" with Dr. Shaffer. (Tr. 432).

In May 2008 Dr. Vitols examined Plaintiff for the Ohio BDD. (Tr. 417-24). Plaintiff weighed 317 pounds and walked with a very slow and shuffled gait. He also showed "some difficulty assuming erect stance from a seated position." (Tr. 419). On examination there was tenderness to palpation throughout the lumbosacral junction. Dr. Vitols could not assess the myospasms due to Plaintiff's obesity. (Tr. 419). Dr. Vitols further wrote, "The claimant reveals significant restricted painful motion within the back as documented on the motion sheet." (Tr. 419; *see* Tr. 423). A straight-leg raising test was positive bilaterally with pain at 55º. Reflexes were absent at the knees and ankles. Dr. Vitols diagnosed a post-laminectomy syndrome with degenerative facet arthropathy of the lumbar spine and exogenous obesity

Based on his examination, Plaintiff's subjective complaints, his history, and clinical objective findings, Dr. Vitols opined that Plaintiff did not have the residual capacity to bend or twist at the waist and that he is limited to short periods of standing and walking and would need to change positions throughout the workday. (Tr. 420). Dr. Vitols also concluded, "The claimant does not have the residual capacity to lift and carry materials of heavy weight on a regular basis." (Tr. 420). Dr. Vitols opined that Plaintiff could occasionally lift up to twenty pounds but could not lift more than twenty pounds. (Tr. 425). Dr. Vitols also believed that Plaintiff could occasionally lift and carry up to ten pounds. *Id*. Dr. Vitols thought that Plaintiff could sit, stand, or walk each from thirty to sixty minutes, one time without interruption. (Tr. 426). And Dr. Vitols believed that during an eight-hour workday, Plaintiff could sit a total of four hours, stand a total of two hours, and walk a total of two hours. (Tr. 426).

### III. The "Disability" Requirement and the ALJ's Decision

The term "disability" as defined by the Social Security Act carries a

specialized meaning of limited scope. Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies.[3] *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

ALJ McNichols resolved Plaintiff's disability claim by using the five-Step sequential evaluation required by the Regulations. *See* 20 C.F.R. §404.1520(a)(4). His most pertinent findings arose at Steps 2 through 5.

At Step 2 the ALJ found that Plaintiff has the following severe impairments: "post-laminectomy syndrome with degenerative facet arthropathy in the lumbar spine, obesity, and depression (NOS)." (Tr. 19).

The ALJ determined at Step 3 that Plaintiff does not have an impairment or combination of impairments that meets or equals the level of severity described in the Listings.[4] (Tr. 23).

At Step 4 the ALJ concluded that Plaintiff could perform light work with the following limitations:

> no climbing ropes, ladders and scaffolding and no balancing; no stooping, kneeling, crouching or crawling; no exposure to hazards or vibrations; no more than frequent exposure to extreme temperatures, humidity or irritants; no more than occasional use of foot controls; no more than four hours of standing and/or walking in an eight-hour workday; the opportunity to alternate between sitting and standing at 30-minute intervals; no direct dealing with the general public; and no requirement to maintain concentration on a single task for more than fifteen minutes at a time.

(Tr. 24)(footnote added). The ALJ also found at Step 4 that Plaintiff was unable to

---

[3] Impairments also must be expected either to cause death or last twelve months or longer. *See* 42 U.S.C. §423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.

[4] The Listings are found at 20 C.F.R. Part 404, Subpart P, Appendix 1.

perform his past relevant work. (Tr. 27).

The ALJ determined at Step 5 that Plaintiff retained the ability to perform a significant number of jobs that existed in the national economy. *See id*.

The ALJ's findings throughout his sequential evaluation led him to ultimately conclude that Plaintiff was not under a disability and therefore not eligible for DIB.

## IV.    Judicial Review

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or

10

deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V. Discussion

### A. Medical Source Opinions

**1.**

Plaintiff contends that he cannot perform even sedentary work on a full-time basis as documented by Dr. Wanat, Dr. Shaffer (his chiropractor), and Dr. Fulton (his neurosurgeon). Plaintiff contends that the ALJ erred in many ways: (1) by not evaluating Dr. Shaffer's opinions as required by *Cruse v. Commissioner of Social Security*, 502 F.3d 532, 541 (6th Cir. 2007), which quoted Social Security Ruling 06-03p, 2006 WL 2329939; (2) by not recognizing that Dr. Shaffer's opinions were consistent with Dr. Wanat's opinions and were not inconsistent with Dr. Fulton's opinions; (3) by not recognizing that the opinions of Drs. Wanat and Shaffer were consistent with the objective medical records; and (4) by finding the opinions of Drs. Wanat and Shaffer inconsistent with Plaintiff's activities of daily living.

Plaintiff further contends that it is not clear that Dr. Vitols' opinion constituted substantial evidence supporting the ALJ's assessment of Plaintiff's Residual Functional Capacity because Dr. Vitols believed that Plaintiff could not lift any amount of weight frequently or do any twisting at the waist.

The Commissioner argues that the ALJ reasonably weighed the opinion evidence when assessing Plaintiff's Residual Functional Capacity and in determining that he retained the ability to perform a limited range of light work.

**2.**

Social Security Regulations and case law require ALJs to apply controlling weight

to a treating medical source's opinion when it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *See* 20 C.F.R. §404.1527(d)(2); *see also Rabbers*, 582 F.3d at 660; *Rogers*, 486 F.3d at 242; *Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If a treating medical source's opinion is not entitled to controlling weight, it must be weighed under "a host of other factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242.

The Regulations consider licensed physicians and certain other medical professionals to be "acceptable medical sources" whose opinions can be used to establish whether a claimant "has a medically determinable impairment." 20 C.F.R. §404.1513(a). Opinions provided by medical personnel and others not qualifying as "acceptable medical sources" – chiropractors, nurse-practitioners, physicians' assistants, teachers, etc., *see* §404.1513(d)(1)-(4) – cannot be used to establish the presence of a medically determinable impairment. *Cruze*, 502 F.3d at 541. Yet their opinions are not ignored. The Regulations tell claimants, "we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work...." 20 C.F.R. §404.1513(d); *see Cruze*, 502 F.3d at 541. In addition, the Court of Appeals in *Cruz* recognized, "[SSR 06-39] explains that opinions from non-medical sources who have seen the claimant in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion.... Finally, the ruling states that:

> [a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions for these 'other sources,' or otherwise ensure that the discussion of

12

> the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.'"

*Cruz*, 502 F.3d at 541 (quoting in part Social Security Ruling 06-03p, 2006 WL 2329939 at *6 (other citation omitted)).

In the present case the ALJ based his assessment of Plaintiff's Residual Functional Capacity mainly on the opinions provided by Dr. Vitols and by the reviewers for the Ohio BDD, Drs. Hill and Cruz. (Tr. 24-25). The ALJ also found Plaintiff's testimony not supported by substantial objective medical evidence or clinical findings and consequently "disproportionate and less-than-credible." (Tr. 27).

The ALJ rejected the opinions of Plaintiff's long-term chiropractor, Dr. Shaffer, and the opinions of one-time examiner, Dr. Wanat, as follows:

> ... Drs. Shaffer and Wanat opined the claimant was reduced to performing significantly less than sedentary work (Exhibits 4F, 22F). These more restrictive opinions are not supported by the objective medical evidence; they are not consistent with the claimant's abilities as demonstrated upon medical examination and as described at the hearing; and they are clearly inconsistent with his reported activities of daily living.... Moreover, Dr. Shaffer is a chiropractor, not an attending physician.

(Tr. 25).

The ALJ applied the correct legal criteria when evaluating the opinions of Dr. Shaffer and Wanat by applying the factors of supportability and consistency. *See id*.; *see also* 20 C.F.R. §404.1527(d)(3)-(4). In addition, earlier in the ALJ's decision, he recognized that Plaintiff "also had a long history of treatment for his back with a chiropractor, Dr. Randall Shaffer (Exhibits 13F, 17F, 22F)." (Tr. 20). The ALJ then described Dr. Shaffer's opinions, *id*., and the legal criteria applicable to his opinions, stating:

> For medical evidence to be considered in determining a severe

> impairment, it must be from an 'acceptable medical source.' (20 CFR 404.1513(a) and 416.913(a)). Dr. Shaffer is a chiropractor, which is not considered an acceptable medical source. Although his opinion cannot be used to determine a medically-determinable impairment or be given controlling weight as a treating physician, it can be used later to show the severity of the claimant's impairment and how it affects his ability to function.

(Tr. 20). With this description together with his later application of the supportability and consistency factors, the ALJ applied the correct legal criteria to his evaluation of Dr. Shaffer's opinions. *See* 20 C.F.R. §404.1513(a), (d); *see also* SSR 06-03p, 2006 WL 2329939 at *6; *Cruz*, 502 F.3d at 541.

Contrary to Plaintiff's contentions, substantial evidence supported the ALJ's finding of only one consistency between the opinions Drs. Shaffer and Wanat – specifically, both Drs. concluded that Plaintiff was "reduced to performing significantly less than sedentary work." (Tr. 25). Except for this consistency, these physicians' opinions differed significantly. Dr. Wanat concluded that Plaintiff could perform "sedentary work on, at least, a part time basis" (Tr. 182); would be able to lift/push/pull up to ten pounds occasionally and five pounds frequently; would need to alternate between sitting, standing, and walking every fifteen to twenty minutes; and could work up to four hours continuously, or up to six hours in a day "if split with 3 hours in the morning followed by 2 hours at home to rest followed by an additional 3 hours in the afternoon." (Tr. 182-83). Dr. Shaffer, in contrast, provided a much more extreme assessment. He concluded that Plaintiff did not have the Residual Functional Capacity to perform medium, light, or sedentary work. (Tr. 410). He believed that Plaintiff could not lift any weight; could sit a total of two hours in an eight-hour workday, no more than thirty minutes at a time; could stand and walk a total of two hours in an eight-hour workday, no more than thirty minutes at a time; could never climb, crouch, kneel, crawl, or stoop; could balance occasionally; could not push or pull; and must avoid heights,

machinery, and vibration. (Tr. 406-10).

Plaintiff's contention that the opinions of Drs. Shaffer and Wanat were consistent with the objective medical evidence does not demonstrate that the ALJ erred or that his assessment of Plaintiff's Residual Functional Capacity was not supported by substantial evidence. Although Plaintiff's MRIs have shown degenerative changes and scar tissue at L5-S1, *see* Tr. 282, 300, 345, 449, the ALJ described this evidence and recognized that Dr. Shaffer and Dr. Vitols each considered this objective evidence. *See* Tr. 20. The ALJ credited nearly all of Dr. Vitols' opinions as supported by the record and based on the specialization factor, as permitted by the Regulations. *See* Tr. 24; *see also* 20 C.F.R. §404.1527(d)(4), (5). In addition, Dr. Vitols' examination, testing, and report were thorough and detailed. *See* Tr. 417-30. Plaintiff points out that Dr. Vitols' opinions were different from the ALJ's in two ways. First, Dr. Vitols did not think Plaintiff could lift any amount of weight frequently. While this is true, *see* Tr. 420, Dr. Vitols provided more specific limitations on Plaintiff's ability to lift (up to twenty pounds occasionally) and his ability to lift and carry (up to ten pounds occasionally). (Tr. 425). These limitations constitute substantial evidence in support of the ALJ's finding that Plaintiff could perform a reduced range of light work. *See* Tr. 24; *see also* 20 C.F.R. §404.1567(b). Second, Plaintiff points out that the ALJ did not adopt Dr. Vitols' conclusion that Plaintiff should not do any twisting at the waist. While this is so, substantial evidence supported the restrictions – no stooping, kneeling, crouching, or crawling – set by the ALJ. *See* Tr. 224-25; 254, 278. This assessment by the ALJ is not altered by the presence of an additional restriction set by Dr. Vitols. *See Blakley*, 581 F.3d at 406 (the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.... Therefore, if substantial evidence supports the ALJ's decision, the Court defers to that finding even if there is substantial evidence in the record that would have supported the opposite conclusion." (internal citations and quotation marks omitted)).

Plaintiff further argues that Dr. Shaffer's opinions were consistent with Dr. Fulton's explanation that "evidence of degenerative disease on MRI was likely the cause of Mr. Kerlin's symptoms." (Doc. #11 at 15 (citing Tr. 231). However, one month earlier, Dr. Fulton more specifically discussed Plaintiff's pain and the objective evidence, explaining, "He had moderately concordant pain at L4-5 but no real structural change in the disc on the radiographic studies and on his MRI, L4-5 was not very impressive. At L5-S1, he does have significant annular tear and degenerative changes on his MRI, but really did not have concordant pain at that level." (Tr. 225). Given that Dr. Fulton's reference to symptoms in May 2005 provided little, if any, information about the severity of Plaintiff's pain levels and given that Dr. Fulton's April 2005 description of the objective evidence did not identify a likely source of severe or significant concordant pain, Dr. Fulton's opinions were not fully consistent with the significant restrictions set by Dr. Shaffer.

Plaintiff lastly argues that the ALJ's rejection of Dr. Shaffer's and Dr. Wanat's opinions as inconsistent with Plaintiff's activities of daily living was erroneous because the ALJ simply ignored Plaintiff's testimony that clarified the extent of his involvement in daily activities. This contention lacks merit because the ALJ did not find Plaintiff's testimony fully credible, and as will be discussed next, the ALJ's credibility findings deserve deference in this case.

Accordingly, Plaintiff's first set of challenges to the ALJ's decision lack merit.

### B.  Plaintiff's Pain Testimony, Daily Activities, and Combination of Impairments

"There is no question that subjective complaints of a claimant can support a claim for disability, if there is also evidence of an underlying medical condition in the record." *Cruse*, 502 F.3d at 542. "However, 'an ALJ is not required to accept a claimant's subjective complaints and may ... consider the credibility of a claimant when making a

determination of disability.... Notably, an ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Id*. (citations omitted).

The ALJ correctly described the legal criteria applicable to the evaluation of a claimant's testimony. *See* Tr. 26; *see also* 20 C.F.R. §404.1529. In doing so, the ALJ did not err as a matter of law.

As indicated above, Plaintiff contends that the ALJ erred in his credibility assessment by overstating Plaintiff's daily activities in numerous ways. This is a valid argument for the reasons Plaintiff provides, *see* Doc. #11 at 15-16, but it does not eliminate the other reasons given by the ALJ for discounting Plaintiff's pain testimony.

The ALJ observed that Plaintiff "appeared to exaggerate his symptoms when he testified at the hearing" and the ALJ supported this with several observations. (Tr. 27). Although the ALJ could not reject Plaintiff's testimony for this reason alone, this was proper consideration since "the ALJ is charged with observing the claimant's demeanor and credibility." *Cruse*, 502 F.3d at 542; *see* Social Security Ruling 96-7p, 1996 WL 374186 at *8. The ALJ also explained in part, "Restricting the claimant to performing the reduced range of light work described above adequately addresses the location, duration, frequency, and intensity of the claimant's alleged symptoms as well as precipitating and aggravating factors. His care has all been conservative since his surgery in 1995; ... and there is no evidence that he suffers from medication side effects that would preclude work activity." (Tr. 27). These are proper considerations under the Regulations, *see* 20 C.F.R. §404.1529(c)(3), and therefore the ALJ's assessment of Plaintiff's credibility is entitled to deference. *See Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence.").

Plaintiff argues that completely absent from the ALJ's pain analysis is a discussion

17

of whether the combination Plaintiff's underlying impairments (degenerative disc disease, obesity, and depression) could reasonably result in the limitations to which Plaintiff testified. Although the ALJ did not specifically refer to Plaintiff's combination of impairments in his discussion of Plaintiff's credibility, *see* Tr. 26-27, the ALJ found multiple severe impairments at Step 2 (including post-laminectomy syndrome, obesity, and depression); considered the combination of Plaintiff's "impairments" – plural – at Step 3 (Tr. 23); relied on Dr. Vitols' opinions, who considered Plaintiff's multiple impairments (Tr. 420); and considered Plaintiff's physical and mental impairments and limitations when assessing his Residual Functional Capacity (Tr. 24-25). The ALJ therefore adequately considered Plaintiff's impairments in combination. *See Loy v. Secretary of Health & Human Services*, 901 F.2d 1306, 1310 (6th Cir. 1990); *see also Gooch v. Secretary of Health & Human Services*, 833 F.2d 589, 591-92 (6th Cir. 1987); *Mitchell v. Astrue*, 256 Fed.Appx. 770, 772 (6th Cir. 2007).

Accordingly, deference to the ALJ's credibility determination is warranted.

## IT THEREFORE IS RECOMMENDED THAT:

1. The Commissioner's non-disability determination be affirmed; and

2. The case be terminated on the docket of this Court.


March 25, 2010                                    s/Sharon L. Ovington
                                                                Sharon L. Ovington
                                                      United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).